IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARYAM ASLANI, | |
| Plaintiff, | Case No. 16-CV-10476 |
| v. | |
| BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, *et al.*, | Judge John Robert Blakey |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Maryam Aslani claims that Defendant Board of Trustees of the University of Illinois (the "University") violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), by dismissing her from the College of Medicine after she was subjected to sexual harassment at a clerkship in pursuit of her medical degree. Before the Court is Defendant's motion for summary judgment [303]. For the reasons explained below, the Court grants Defendant's motion.

**I.  Background**[1]

At all relevant times, Plaintiff Maryam Aslani was a medical student at the University of Illinois College of Medicine with an expected graduation date in May 2016. [353] ¶ 1.

---

[1] The Court draws the background facts from the parties' statements of material facts, responses thereto, and cited records. [311]; [353]; [354].

1

### A. Plaintiff's Clerkship at Christ Hospital

On August 3, 2015, Plaintiff began a clerkship at the psychiatric unit at Christ Hospital and Medical Center ("Christ Hospital").[2] During the course of her clerkship, Plaintiff had meetings with the program site director, Dr. David Kemp, and with two instructors, Drs. Kim Miller and Nathan Ontrop, regarding certain alleged misconduct. *Id.* ¶ 7. Subsequently, Plaintiff claimed that her instructors "battered her and harassed her" during the course of the clerkship. *Id.* ¶ 10. Christ Hospital investigated Plaintiff's claims and found they had no basis. *Id.* ¶ 11. Plaintiff received a grade of unsatisfactory for the clerkship, and her evaluation from Dr. Kemp stated that he was approached "by three different individuals" with concerns about Plaintiff's behavior. *Id.* ¶¶ 13–14. In order to graduate, Plaintiff would be required to repeat the psychiatry clerkship. *Id.* ¶ 17.

Plaintiff contested the unsatisfactory grade through the University's internal grievance process. *Id.* ¶ 18. Dr. Raymond Curry, Senior Associate Executive Dean of the College of Medicine, denied her grievance on January 22, 2016. *Id.* ¶¶ 18–19. As part of the grievance process, Plaintiff provided Dr. Curry with recordings of her meeting with Dr. Miller and Dr. Ontrop. *Id.* ¶ 20. According to Drs. Miller and Ontrop, Plaintiff created these recordings without their consent. *Id.* ¶ 21. Dr. Curry admonished Plaintiff, warning her that if she engaged in unprofessional conduct again, he would also revisit her actions in making the recordings. *Id.* ¶ 8, 20–21.

---

[2] A clerkship, which is also sometimes referred to as a "rotation" or "elective," is an educational experience in which students are assigned to a hospital or other medical provider to assist with patient care. [353] ¶ 5–6.

2

### B. Plaintiff's Clerkship with Dr. Babak Lami

In July 2015, prior to beginning her clerkship at Christ Hospital, Plaintiff contacted Dr. Babak Lami, an orthopedic surgeon who worked at the Illinois Spine Institute, to ask if she could participate in a self-designed clerkship[3] with him. *Id.* ¶ 23, 29. Plaintiff found Dr. Lami's name on a bulletin board at the University and contacted him of her own accord. *Id.* ¶ 29. No one at the University suggested, recommended, or directed that Plaintiff contact Dr. Lami. *Id.* ¶ 30. According to Plaintiff, Dr. Lami agreed to let her participate in a self-designed clerkship at his office and signed a course description[4] reflecting his approval. *Id.* ¶ 26. Plaintiff attended her clerkship with Dr. Lami from July to September 2015, during which time Plaintiff alleges Dr. Lami subjected her to inappropriate and unwanted physical contact. *Id.* ¶ 32.

On December 15, 2015, Plaintiff submitted the signed coursework letter to the College of Medicine. *Id.* ¶ 33. The coursework letter states that the clerkship would run from January 4 to January 30, 2016; it does not mention the July through September dates. [311-5]. The description also contains Dr. Lami's signature and came from an email account named "lamibabak@gmail.com." [353] ¶ 33–34; [311-5]. Plaintiff created this email account for the purpose of submitting her clerkship materials to the University, and she, not Dr. Lami, owned the account. *Id.* ¶ 34. The

---

[3] A self-designed clerkship is a clerkship that a student arranges with a mentor independent of the College of Medicine. *Id.* ¶ 24. The student and mentor create a protocol for the clerkship together called a "coursework letter." *Id.*

[4] The parties refer to this letter at various times as a "course description," a "coursework letter," and a "course outline." *See, e.g. Id.* ¶¶ 24, 26–27, 46; [352] at 3, 9–11. Ostensibly, each of these terms refers to the same letter found at [311-5] at 2–3.

University approved the clerkship based on the submitted coursework letter, but Plaintiff did not attend a clerkship at Dr. Lami's office in January 2016. *Id.* ¶ 37.

On January 31, 2016, the University College of Medicine registrar, Kathleen Helling, sent an evaluation form to Plaintiff, which Plaintiff forwarded to Dr. Lami. *Id.* ¶¶ 42, 44. Christine Martin, from Dr. Lami's office, contacted Ms. Helling to inform her that Dr. Lami could not complete the evaluation. Ms. Martin told Ms. Helling that Plaintiff had not been present at Dr. Lami's office in January 2016 and that Dr. Lami had not seen or approved the course description letter. *Id.* ¶¶ 45-47.[5]

### C. The University's Disciplinary Actions

On February 5, 2016, Dr. Sam Chmell, Chair of the Campus Student Promotions Committee ("CSPC"), sent Plaintiff a letter, explaining that submitting a false course description for a clerkship she did not complete amounted to unprofessional conduct and would be evaluated by CSPC. *Id.* ¶ 50. On February 6, after receiving this letter, Plaintiff brought a cake to Dr. Lami's house and attempted to discuss his report to the University. *Id.* ¶ 52. Two days later, on February 8, Plaintiff's husband went to see Dr. Lami at his office, asking him to "have mercy" on Plaintiff. *Id.* ¶ 53.

On February 8, 2016 CSPC voted to recommend Plaintiff's dismissal to the College Committee on Student Promotions ("CCSP"). *Id.* ¶ 54. After CSPC voted to recommend Plaintiff's dismissal, Plaintiff claimed Dr. Lami lied about failing to sign the coursework description and was retaliating against Plaintiff for rejecting his

---

[5] Plaintiff disputes that Dr. Lami did not see or approve the coursework letter, but Plaintiff does not dispute that Ms. Martin conveyed this information to Ms. Helling. [353] ¶ 47.

sexual advances. *Id.* ¶ 55. Dr. Chmell was unaware of these claims when he sent his February 5 letter to Plaintiff. *Id.* ¶ 56.

On March 25, 2016, CCSP voted to dismiss Plaintiff. *Id.* ¶ 62. Plaintiff appealed that decision, and on April 29, 2016, Plaintiff appeared before CCSP to argue against her dismissal. *Id.* ¶ 64. Plaintiff's attorney also attended the hearing, and Plaintiff submitted extensive documentation in support of her appeal, including a letter from her attorney dated March 21, 2016, detailing the state court complaint Plaintiff filed against Dr. Lami for sexual harassment and retaliation. *Id.* ¶¶ 64–66. On that same day, CCSP denied Plaintiff's appeal and finalized her dismissal from the College of Medicine for engaging in unprofessional conduct. *Id.* ¶ 70.

### D. Plaintiff's Title IX Reporting

According to Plaintiff, her mother reported Dr. Lami's sexual harassment to the University's Office of Access and Equity in September 2015 by leaving a voice message with the office. *Id.* ¶ 58. Plaintiff does not know (and the record fails to otherwise show) whether anyone at the University received this voice message or was at any time aware of its existence. *Id.* ¶ 59. Other than the September 2015 voice message, Plaintiff indicated that she first informed the University of her complaint of sexual harassment in mid-February 2016. *Id.* ¶ 61.

On April 12 and 13, 2016, Plaintiff also told Amy Truelove, the University's Deputy Title IX Coordinator and Equity Compliance Specialist, that Dr. Lami had sexually harassed her. [354] ¶¶ 15, 25. Plaintiff alleged that the College of Medicine failed to notify the Title IX office about Plaintiff's sexual harassment claims in

5

accordance with the University's Title IX policy. *Id.* ¶ 20; *see also* [354-4]. Ms. Truelove investigated Plaintiff's claim by speaking with Plaintiff and her mother; attempting to contact Dr. Lami, who declined to participate in the investigation; and reviewing documents provided by Plaintiff, including the state court complaint filed by Plaintiff, a letter sent to the University by Plaintiff's lawyer, and various other emails from Plaintiff. [353] ¶¶ 82–83.

On July 24, 2016, Ms. Truelove issued a final report of her investigation, which found that CCSP failed to follow the University's sexual misconduct policy by failing to notify the University's Title IX office of Plaintiff's allegations of sexual harassment. *Id.* ¶ 85; [354] ¶¶ 19–21; *see also* [354-4]. Plaintiff subsequently filed a grievance challenging the dismissal, which Dimitri Azar, the Dean of the College of Medicine, denied on October 21, 2016. [353] ¶¶ 75–77.

Plaintiff filed this suit on November 9, 2016 [1] and has since filed five amended complaints, [19], [54], [71], [94], and [125]. On January 30, 2020, the University, as the only remaining defendant in this action, filed a motion for summary judgment. [303].

## II. Legal Standard

Summary judgment is appropriate where the movant shows through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, this Court has "one task and one task

only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

To withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The Court must construe the record "in the light most favorable to the nonmovant" and avoid the "temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The nonmovant, though, "must do more than raise a metaphysical doubt as to the materials facts. Rather, she must come forward with specific facts showing that there is a *genuine issue for trial.*" *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000) (citation omitted).

### III. Analysis

Plaintiff brings a claim under Title IX, alleging that the University knew about the sexual harassment Plaintiff endured during her medical clerkship with Dr. Lami and failed to adequately address the harassment in accordance with federal law. [352] at 5–10. Plaintiff further alleges that the University's dismissal of Plaintiff from the College of Medicine was retaliation for Plaintiff's notifying the University of the sexual harassment. *Id.* at 10–12.

#### A. Title IX Liability under *Davis*

Title IX of the Education Amendments of 1972 provides that no person in the United States "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or

7

activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Title IX gives rise to an implied right of action for students seeking to recover money damages. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). The statute creates an obligation for schools to respond to reported incidents of sexual harassment. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). A student seeking to challenge her school's response to an incident of harassment, however, may only recover if the school's response is "deliberately indifferent" to discriminatory conduct of which it had "actual knowledge." *Id.* As the Seventh Circuit recently articulated it, "a school's response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022). Further, because a funding recipient "cannot be liable for its indifference to harassment it lacks the authority to prevent," the recipient is only liable if it has "substantial control over both the harasser and the context in which the known harassment occurs." *Doe-2 v. McLean County Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 512 (7th Cir. 2010) (citing *Davis*, 526 U.S. at 630).

The Court construes Plaintiff's first argument as a claim under *Davis* because it focuses on the University's failure to adequately address Plaintiff's assertions that Dr. Lami harassed her. [6] In order to satisfy the *Davis* standard and succeed on this

---

[6] Plaintiff does not argue that the University is liable for direct discrimination on the basis of sex under Title IX, but rather relies upon the *Davis* framework to argue that the University was deliberately indifferent in responding to Dr. Lami's harassment. *See Jauguet v. Green Bay Area Catholic Education, Inc.*, 996 F.3d 802, 809–10 (7th Cir. 2021) (distinguishing between direct and indirect Title IX claims). Thus, the Court need not consider any potential direct liability of the University under Title IX. *See Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2011) (failure to raise arguments in opposition to summary judgment constitutes waiver).

theory, Plaintiff must present evidence to show that the University had substantial control over the harasser—Dr. Lami—and the context in which the harassment occurred—Plaintiff's clerkship at the Illinois Spine Institute.

But Plaintiff fails to show (or even argue) that the University had substantial control over Dr. Lami. She argues only that she need not prove Dr. Lami was an agent of the University in order to establish the University's liability under Title IX. [352] at 5–6. Plaintiff is correct that agency is not the controlling standard. But she fails to identify and meet the proper standard (substantial control) and, critically, fails to argue that the University exercised substantial control over Dr. Lami or the context in which she was harassed. Nor could she have done so based upon the facts in the record.

Unlike the student in *Davis*, there is no evidence on the record that the University had any authority over Dr. Lami, including disciplinary authority. Dr. Lami was not an employee of the University and no one at the University suggested, recommended, or directed Plaintiff to contact him. [353] ¶ 28-30. At most, Plaintiff testified that Dr. Lami was a "University of Illinois affiliate and donor" which she explained meant that he "had a professional relationship" with the University during Plaintiff's clerkship. *Id.* ¶ 28; [353-9] at 111–18; [354] ¶ 33. Plaintiff's vague assertions that Dr. Lami was an "affiliate" of or had a "professional relationship" with the University fall far short of the substantial control standard articulated in *Davis*. 526 U.S. at 646–47. Plaintiff identifies no evidence that the University had "supervisory authority" over Dr. Lami, had the "authority to take remedial action"

9

against him, or exercised control over the context in which the harassment occurred. *See Doe-2*, 593 F.3d at 512. Without substantial control over the harasser and the location of the harassment, the University cannot be liable under Title IX for its response to Dr. Lami's conduct. *Id.* Plaintiff's *Davis* claim fails.

### B. Retaliation

In order to state a claim for retaliation under Title IX, Plaintiff must allege that she: (1) engaged in protected activity under Title IX; (2) the University took a materially adverse action against her; and (3) there was a but-for causal connection between the two. *Doe v. Columbia College Chicago*, 933 F.3d 849, 857 (7th Cir. 2019) (citing *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017)). The parties do not dispute that Plaintiff engaged in protected activity when she reported sexual harassment to the University and that the University took a materially adverse action against her when it dismissed her from the College of Medicine. Thus, the Court focuses its inquiry upon whether Plaintiff has submitted evidence sufficient to create a material factual dispute regarding but-for causation.

To establish a causal connection, Plaintiff must show that her report to the University was a "substantial or motivating factor" in the University's decision to dismiss her. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008)).[7] Plaintiff may rely upon either direct evidence or circumstantial evidence to prove that her protected activity

---

[7] The Seventh Circuit has held that the "Title VII retaliation framework applies with equal force to retaliation claims brought under Title IX." *Milligan v. Board of Trustees of Southern Illinois University*, 686 F.3d 378, 388 (7th Cir. 2012). Thus, this Court relies upon cases involving both Title IX and Title VII claims to analyze Plaintiff's retaliation claim.

10

motivated the University's decision to dismiss her. *Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 858 (7th Cir. 2008). Direct evidence "typically involves an admission by the decision maker regarding the retaliatory intent" whereas circumstantial evidence creates an inference of retaliation. *Id.* The Seventh Circuit has recognized three categories of circumstantial evidence that can create a "convincing mosaic" of retaliatory motive: (1) suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn"; (2) evidence "that similarly situated employees were treated differently"; and (3) "evidence that the employer offered a pretextual reason for an adverse employment action." *Coleman*, 667 F.3d at 835 (citations omitted). Plaintiff appears to rely on categories (1) and (3) to support her claim.

### 1. Suspicious Timing

To create an inference of causation based upon suspicious timing, the individual who decided to take the adverse action must have known that Plaintiff engaged in the protected activity. *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 586 (7th Cir. 2021). Further, the protected activity must follow "close on the heels" of the protected activity. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (quotation omitted). There is no legally prescribed time period, but courts "typically allow no more than a few days to elapse between the protected activity and the adverse action." *Id.* Regardless of the time period between events, the Court will not make an inference of causation based upon suspicious timing "when there is a 'significant

intervening event' separating the protected activity and deprivation." *FKFJ*, 11 F.4th at 586 (quoting *Kidwell*, 697 F.3d at 967).

While Plaintiff argues that there is a factual dispute regarding when the University first received actual notice of Plaintiff's sexual harassment, she does not argue that Dr. Chmell, Chair of the CSPC, or any other committee members were aware of her sexual harassment claims when the committee first recommended her dismissal. [353] ¶ 56. In short, the record contains insufficient evidence to raise an inference of causation between the September 2015 voice message and the CSPC's recommendation to dismiss Plaintiff from the College of Medicine. *See FKFJ*, 11 F.4th at 586.

Moreover, even if Dr. Chmell had been aware of Plaintiff's claims of sexual harassment, the adverse action did not occur "close on the heels" of the protected activity. The protected activity allegedly occurred in September 2015, and Dr. Chmell did not first take adverse action against Plaintiff until February 2016. This extended time gap alone undermines any inference of causation based upon suspicious timing. *See Kidwell*, 679 F.3d at 967 (finding two months was too long a gap to infer causation).

Even setting aside the four-month gap between the protected activity and the adverse action, any inference of causation is also defeated in Plaintiff's case by the significant intervening events that occurred between the September 2015 voice message and the first adverse action.

12

On January 31, 2016, Ms. Helling, the University registrar, sent an evaluation form to Plaintiff for her clerkship, which Plaintiff forwarded to Dr. Lami. [353] ¶¶ 42, 44. Ms. Martin, from Dr. Lami's office, contacted Ms. Helling and informed her that Plaintiff had not been to Dr. Lami's office in January 2016 and that Dr. Lami did not approve the coursework description Plaintiff submitted to the University. *Id.* ¶¶ 44–47.

Just days later, on February 5, Dr. Chmell sent Plaintiff a letter, notifying her that the CSPC would evaluate her conduct. *Id.* ¶ 50. The letter stated that Plaintiff acted unprofessionally by falsely submitting a coursework description to obtain approval for a clerkship in which she did not participate. *Id.* Three days later, on February 8, 2016, the CSPC voted to recommend Plaintiff's dismissal to the CCSP. [353] ¶ 54.

It is clear from this sequence of events that the University's discovery of Plaintiff's "unprofessional conduct" interrupted any causal nexus between the protected activity and the adverse action. Thus, the record cannot support an inference of causation based upon suspicious timing. *See FKFJ*, 11 F.4th at 586.

### 2. Pretextual Reasoning

Even if the timing of Plaintiff's dismissal was suspicious in relation to the timing of her report, "suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial." *Amrhein*, 546 F.3d at 859. While Plaintiff argues that the University's decision was pretextual and the decision was in fact retaliation for her harassment report, she fails to point to any evidence to support

13

this claim. In determining whether a reason for adverse action was pretextual, the Court need not consider whether the University's "stated reason was inaccurate or unfair," but rather whether it "honestly believed the reasons it has offered" for the dismissal. *Coleman*, 667 F.3d at 852 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)).

The minutes from Plaintiff's appeal to the CSPC detail the numerous legitimate reasons for Plaintiff's dismissal. These reasons include: (1) Plaintiff's behavior at her Christ Hospital clerkship, including unlawfully recording supervisors without their consent; (2) Plaintiff's appearance at Dr. Lami's house and her husband's appearance at Dr. Lami's office after Plaintiff received Dr. Chmell's initial disciplinary letter on February 5; (3) the variation between Dr. Lami's signatures on certain forms and Plaintiff's ownership of a fake email account in his name; (4) Plaintiff's violation of University policy by submitting her coursework description for a clerkship after she had completed it instead of before; (5) Plaintiff's failure to inform the College of Medicine that she would no longer be completing a clerkship with Dr. Lami in January 2016; and (6) Plaintiff's unprofessional behavior throughout the disciplinary process. [311-25] at 4–5.

There is no evidence on the record that these reasons were pretextual. Plaintiff acknowledges that the University believed she had engaged in unprofessional conduct, [353] ¶¶ 47–48, 50; that Dr. Chmell was not aware of her sexual harassment allegations when the CSPC first recommended her dismissal due to unprofessional conduct, *id.* ¶¶ 54–57, 60–61; and that Plaintiff was entitled to, and did in fact,

14

provide all relevant information to the University in support of her appeal of the dismissal, including information about the sexual harassment allegations, *id.* ¶¶ 64–67, 75. Plaintiff fails to show (or even argue) that the committee did not honestly believe the stated reasons for her dismissal, and Plaintiff's mere disagreement with the committee's ultimate findings remains insufficient to establish pretext. *See Coleman*, 667 F.3d at 835.

Plaintiff suggests that the University's failure to properly investigate whether her sexual assault allegations were substantiated before dismissing her constitutes evidence of pretext. [352] at 11. But the only evidence she points to in support of this argument is the University's failure to wait for the final Title IX report before dismissing her. The undisputed facts foreclose this argument. Dr. Chmell, chair of the CSPC, was not aware of Plaintiff's claims of sexual harassment when the committee first made its recommendation to dismiss Plaintiff. Once the CCSP became aware of Plaintiff's allegations, it provided Plaintiff the opportunity to present all evidence and arguments against her dismissal, which the committee considered prior to making its final decision. And as discussed previously, the committee provided numerous other reasons for dismissal that were not predicated upon Dr. Lami's claims that Plaintiff falsified course documents.

The University has maintained the same reasons for Plaintiff's dismissal both before and after it learned of Plaintiff's sexual harassment allegations, and before and after Ms. Truelove launched the Title IX investigation. Thus, the University's

failure to wait for the issuance of a final Title IX report does not support a finding of pretext.

Finally, to the extent Plaintiff attempts to impute Dr. Lami's retaliatory intent to the University by claiming it relied upon his allegations, this argument also fails. If a decision-maker, in this case the CCSP, is "not wholly dependent on the single source of information, but instead conducts its own investigation into the facts relevant to the decision," it is not liable for the source's misinformation. *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007). It is clear from the record that Dr. Lami was not the only source of information upon which the CCSP relied in making its determination. Plaintiff was given the opportunity to submit documentation and to give a statement at both the initial February 8 CSPC hearing and the April 29 CCSP appeal hearing. [353] ¶¶ 51, 64. Plaintiff attended the April 29 hearing with her attorney and submitted extensive documentation in support of her position. *Id.* ¶ 64–66.

In sum, Plaintiff fails to point to any evidence that the University did not "honestly believe[] the reasons it has offered" and thus her pretext argument—and her retaliation claim—fail.

## IV. Conclusion

For the reasons explained above, the Court grants Defendant's Motion for Summary Judgment [303] as to all counts. Civil case terminated.

Dated: October 6, 2023

                                              Entered:

                                              _____
                                              John Robert Blakey
                                              United States District Judge